IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SARA C. CHAISSON                                                                    PLAINTIFF

            v.                              Civil No.   14-5288

DUSTIN JOHNSON, Drug Task Force (DTF),
Rogers Police Department; and CHRISTOPHER
WAYNE FOSTER, Confidential Informant                              DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

        This is a civil rights case filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*

        Plaintiff is incarcerated in the Federal Correctional Institution in Tallahassee, Florida.

Plaintiff is currently serving a term of imprisonment for conspiracy to distribute

methamphetamine.  United States v. Chaisson, No. 5:14-cr-50054-001 (Doc. 26).

        When she filed this action, Plaintiff was incarcerated in the Washington County

Detention Center in Fayetteville, Arkansas.  Plaintiff maintains her constitutional rights were

violated when the Detective Johnson used a sexual predator, Christopher Foster (hereinafter

Foster), as a confidential informant in order to set up a "controlled buy" of drugs.

        Detective Johnson filed a Motion for Summary Judgment (Doc. 50).  A hearing was

scheduled for March 14, 2016, to allow the Plaintiff to testify in response to the Motion.  At the

beginning of the hearing, Plaintiff requested that her deposition, which was submitted as an

exhibit, be used as her version of the facts of the case.

        Plaintiff has sued Detective Johnson in both his individual and official capacities.  Foster

was served on September 15, 2015 (Doc. 33).  No answer was ever filed on his behalf.  A notice

-1-

AO72A
(Rev. 8/82)

of default procedures was directed to the Plaintiff on March 14, 2016 (Doc. 56), but Plaintiff has not responded to the notice in any way.

## 1.  Background

Detective Johnson has been employed by the Rogers Police Department since September of 2009.  *Defendant's Exhibit* (hereinafter *Defts' Ex.*) 2 at ¶¶ 2-3.  He began using Foster as a confidential informant in October of 2013.  *Id.* at ¶ 2.

At the time, Foster was on probation on charges of aggravated assault and promoting prostitution stemming from conduct occurring in 2010.  *Deft's Ex.* 2 at ¶ 5.  Detective Johnson discussed Foster's charges with him and the explanation provided led Detective Johnson to believe Foster was in no way a threat to those he came into contact with.  *Id.* at ¶ 8.  Detective Johnson believed Foster could be used as an informant according to Department Policy.  *Id.; Deft's Ex.* 7.  Detective Johnson did not believe that using Foster as an informant would lead to any assaults, sexual or otherwise, being committed by Foster.  *Deft's Ex.* 2 at ¶ 15.

The use of Foster as a confidential informant was approved by Foster's probation officer and by the Honorable Brad Karren, Judge for the Nineteenth West Judicial Circuit, located in Bentonville.  *Id.* at ¶¶ 6-7; *Deft's Ex.* 3 at 1.  Foster was the only viable confidential informant that had been located.  *Deft's Ex.* 3 at 2.  He was to be used to help dismantle a Northwest Arkansas drug trafficking organization.  *Id.*

Foster's initial instructions were to make contact with Stacy Collins and Tommy Maples.  *Deft's Ex.* 2 at ¶ 9.  Plaintiff was introduced to Foster by Collins and Maples in November of 2013 at a Denny's Restaurant.  *Deft's Ex.* 1 at 7-8.[1]  Plaintiff had sold drugs to Maples.  *Id.* at 8.

---

[1]Page citations to this exhibit are to the deposition page numbers.

When Foster attempted to talk to her about drugs, Plaintiff declined, saying she did not feel comfortable talking to him.  *Id.*

Foster informed Detective Johnson that he had met Plaintiff and that she distributed large amounts of methamphetamine.  *Deft's Ex.* 2 at ¶ 10.  Detective Johnson instructed Foster to ascertain the quantity of methamphetamine Plaintiff could supply him along with prices and then to notify Detective Johnson before any action was taken.  *Id.* at ¶ 11.

Foster was never instructed to engage in a sexual or romantic relationship with the Plaintiff; however, Foster was instructed to try and develop a relationship with her to facilitate buys.  *Deft's Ex.* 2 at ¶ 14.  Foster began communicating with Plaintiff via Facebook and text messages to her cell phone.  *Defts' Ex.* 1 at 8.  Plaintiff described the messages as kind of flirty. *Id.* at 10-11.

Sometime in late 2013 or early 2014, they set up a meeting at a bank in Lowell at which time Plaintiff was going to sell Foster drugs.  *Deft's Ex.* 1 at 11-12.  Plaintiff did not show up for some reason she could no longer recall.  *Id.*

After this, Foster called Plaintiff and asked if she still wanted to "hang out" because he wanted to get to know her.  *Deft's Ex.* 1 at 11-13.  She agreed and he picked her up at her house in Springdale.  *Id.* at 13-14.  She got in the car willingly and voiced no objections to going to Eureka Springs with him where he owned a hotel.  *Id.* at 14-15.  She was high on methamphetamine at the time.  *Id.* at 15.

Plaintiff testified that on the way, Foster started "acting weird" and making comments like "so you probably think I'm going to take you out here and  murder and rape you." *Id.* at 16.

Plaintiff indicated she had no clue where that came from. *Id.* She had her cell phone with her. *Id.* at 17.

After they got to the hotel, Plaintiff testified "stuff ended up going further than what we was supposed to and we ended up having sexual intercourse." *Defts' Ex.* 1 at 16. She was not forced into the hotel or restrained in anyway. *Id.* at 17. However, she testified she was out in the country, it was snowing, she had no clue where she was, and it was late, about 10:30 or 11:00 p.m. *Id.* Plaintiff testified she had never been to Eureka Springs prior to that day. *Id.* She indicated Foster would be okay for awhile and then he would start bragging about getting away with federal charges, being able to make things happen to people, and having money. *Id.* at 19-20.

At some point, Plaintiff texted an acquaintance to come and pick her up but it took him a couple of hours to get there. *Deft's Ex.* 1 at 18-21. She could not recall if she did this before or after she and Foster engaged in sexual intercourse. *Id.*

Foster never asked her to have sex it just "started happening." *Deft's Ex.* 1 at 22. She at no time before, or during, the sexual intercourse said no, I want to stop. *Id.* The sex was consensual. *Id.* at 26. She was no longer high at this point. *Id.* at 28.

Plaintiff testified that at some point while they were engaged in sexual intercourse, Foster became violent and choked her until she almost passed out, pulled her hair, and slapped her. *Deft's Ex.* 1 at 22-23. She could not recall if the choking left a mark or a bruise and testified there were no photographs. *Id.* at 23. When she left the hotel, she did not notice any bruising. *Id.* at 24. She told her mother about the encounter. *Id.* at 25. She never made a complaint to the police about Foster. *Id.* at 32.

AO72A
(Rev. 8/82)

They never had another sexual encounter of any type. *Deft's Ex.* 1 at 26. Foster did send her "crazy text messages." *Id.* On one occasion he said he was going to come over, tie her hands behind her back, and have oral sex with her until she "puked." *Id.* At one point, Plaintiff testified she even changed her cell phone number but Foster somehow obtained the new number. *Id.* at 29-30.

Despite the sexual encounter and the texts, she met with Foster again. *Deft's Ex.* 1 at 31. Plaintiff testified she met with him on February 4th, she believed, to sell him drugs. *Id.* She brought them to him at a Walmart where they did the exchange. *Id.* She then left. *Id.* She testified she was afraid of him at that point but just met him to get him "off [her] back." *Id.* at 32.

According to Detective Johnson, they set up a total of three controlled buys. *Defts' Ex.* 2 at ¶ 12. The first controlled buy actually occurred on January 22, 2014. *Deft's Ex.* 4. Foster contacted Detective Johnson indicating he could purchase 28 grams of methamphetamine from the Plaintiff. *Id.* That same day, Foster set up the buy and the two met at the Wal-Mart at the Pleasant Grove exit in Rogers, exchanged drugs for money, and then Plaintiff left. *Id.* Plaintiff testified she got into the car with Foster but that he did not touch her and did not make any sexual remarks that she recalled. *Deft's Ex.* 1 at 34. She took someone with her to the controlled buy. *Id.* at 52.

On February 2, 2014, Foster contacted Detective Johnson and said he could purchase 56 grams of methamphetamine from the Plaintiff. *Deft's Ex.* 4. They met the same day, at the same location, and exchanged drugs for money. *Deft's Ex.* 1 at 35; *Deft's Ex.* 4. Plaintiff again got

AO72A
(Rev. 8/82)

in the car with Foster but he did not touch her that she recalled.  *Deft's Ex.* 1 at 35-36.  She also took someone with her to this buy.  *Id.* at 52.

For awhile, Foster stopped texting her.  *Deft's Ex.* 1 at 36.  Then "out of the blue," he texted her and wanted to met at Jose's in Springdale to purchase drugs.  *Id.*  Foster advised Detective Johnson that the Plaintiff would be at Jose's.  *Deft's Ex.* 6.  Plaintiff took two friends with her to this buy.  *Deft's Ex.* 1 at 41.  She took someone with her to each buy because she felt threatened by Foster.  *Id.* at 52.

When she arrived at Jose's, Plaintiff was arrested for the first two controlled buys as well as the 62.5 grams of methamphetamine she had on her person.  *Deft's Ex.* 1 at 41.  Detective Johnson was present at Jose's.  *Deft's Ex.* 1 at 37.  After she was arrested, she was taken to the Rogers Police Department and interrogated by Detective Johnson.  *Id.* at 46.

Detective Johnson monitored all three controlled buys.  *Deft's Ex.* 2 at ¶ 13.  There was no indication that Foster was a threat to the Plaintiff and she did not appear nervous or frightened.  *Id.*  During her arrest and interrogation, Plaintiff never said anything about having sex with Foster or him choking or slapping her.  *Deft's Ex.* 1 at 55.  After her arrest, Plaintiff became a confidential informant and participated in one controlled buy.  *Id.* at 62.

Plaintiff felt Detective Johnson was okay with Foster doing whatever was necessary to try and get close to the Plaintiff and to be able to buy drugs from her.  *Deft's Ex.* 1 at 49.  At some point, Plaintiff "Googled" Foster and found out he had been arrested for kidnaping, aggravated assault, and promoting prostitution.  *Id.* at 50.  She could not specifically recall if she did this before or after the controlled buys, but she did not believe she would have went near him

after she learned about his charges. *Id.* After she was arrested, Maples told her that Foster used to "prostitute women" out of his hotel. *Id.* at 52, 57.

At the time, Plaintiff was twenty-five years old. *Deft's Ex.* 1 at 59. She felt her name and character were defamed because she became known as a drug dealer. *Id.* at 58. She did, however, sell drugs to Foster. *Id.* Since she has been incarcerated, she has been diagnosed with Post Traumatic Stress Disorder (PTSD). *Id.* at 59. She believes the PTSD is the result of the conduct of Foster, the officers, and many things that have happened in her life. *Id.* at 60-61.

With respect to her official capacity claim, Plaintiff states she named Detective Johnson in his official capacity solely because he works for the City of Rogers. *Deft's Ex.* 1 at 64-65. Plaintiff indicated she did not know of any custom, policy, or practice of the City of Rogers that violated her rights. *Id.* She did, however, believe there should be "some kind of law or something about confidential informants, there should be some way for controlled buys that are supposed to be handled." *Id.*

Detective Johnson does not and never has had the authority to make final policies for the City of Rogers or the Rogers Police Department. *Deft's Ex.* 2 at ¶ 16. The Rogers Police Department has policies in place that require its officers to "recognize and comply with those rights granted to individuals by the United States Constitution, all applicable statutes and ordinances, and those cases decisions which impact the department. *Deft's Ex.* 8, Policy 103.2.

## 2.  Detective Johnson's Summary Judgment Motion

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any

AO72A
(Rev. 8/82)

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"Once a party moving for summary judgment has made a sufficient showing, the burden rests

with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that

a genuine issue of material fact exists." National Bank of Commerce v. Dow Chemical Co., 165

F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical

doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient

evidence to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "A case founded on speculation

or suspicion is insufficient to survive a motion for summary judgment." Id. (citing, Metge v.

Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

Detective Johnson has moved for summary judgment on the following grounds: (1)

Plaintiff's substantive due process rights were not violated; (2) he is entitled to qualified

immunity in his individual capacity; and (3) Plaintiff's official capacity claim fails because no

custom, policy, or practice  of the City of Rogers led to any violation of the Plaintiff's

constitutional rights.

Section 1983 provides a federal cause of action for the deprivation, under color of law,

of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the

United States.  In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the

defendant acted under color of state law and that he violated a right secured by the Constitution.

West v. Atkins, 487 U.S. 42 (1988); Dunham v. Wadley, 195 F.3d 1007, 1009 (8th Cir.1999).

The deprivation must be intentional; mere negligence will not suffice to state a claim for

-8-

deprivation of a constitutional right under § 1983. <u>Daniels v. Williams</u>, 474 U.S. 327 (1986); <u>Davidson v. Cannon</u>, 474 U.S. 344 (1986).

Qualified immunity "is an *immunity from suit* rather than merely a defense to liability." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985) (emphasis in original). It entitles an individual to not be subject to trial or the other burdens of litigation and "is effectively lost if a case is erroneously permitted to go to trial." *Id.* Accordingly, it is important that the question of qualified immunity be resolved as early as possible in the proceedings. <u>O'Neil v. City of Iowa City</u>, 496 F.3d 915, 917 (8th Cir. 2007) (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001); <u>Schatz Family ex rel. Schatz v. Gierer</u>, 346 F.3d 1157, 1160 (8th Cir. 2003)).

Analyzing a claim of qualified immunity requires a two-step inquiry. <u>Jones v. McNeese</u>, 675 F.3d 1158, 1161 (8th Cir. 2012). In one step, the deciding court determines "whether a constitutional right would have been violated on the facts alleged." <u>Saucier</u>, 533 U.S. at 200. In step two, the court determines whether the implicated right was clearly established at the time of the deprivation. <u>Id.</u> In considering those steps at the summary judgment phase, the court is required to view the genuinely disputed facts in the light most favorable to the non-moving party, provided the record does not so contradict the facts as to render so viewing them unacceptable to any reasonable juror. <u>O'Neil</u>, 496 F.3d at 917.

In general, the "states have no affirmative obligation to protect individuals against private violence." <u>Hart v. City of Little Rock</u>, 432 F.3d 801, 805 (8th Cir. 2005)(citing <u>DeShaney v. Winnebago County Dep't of Social Services</u>, 489 U.S. 189, 197 (1989)). "Substantive due process does, however, require a state to protect individuals under two theories. First, the state owes a duty to protect those in its custody. Second, the state owes a duty to

-9-

protect individuals if it created the danger to which the individuals are subjected." <u>Hart</u>, 432 F.3d at 805 (citation omitted).

Here, there was no custodial relationship. <u>K.B. v. Waddle</u>, 764 F.3d 821, 824 (8th Cir. 2014). Plaintiff voluntarily engaged in drug transactions with the confidential informant. Thus, if a duty is owed to the Plaintiff, it must be based on the state created danger theory.

To establish a claim under the state-created danger theory, the Plaintiff must show that the State took affirmative action that increased the danger to Plaintiff. <u>Id.</u> The elements of such a claim require a Plaintiff to show that: (1) she is a member of a limited, precisely defined group; (2) Detective Johnson's conduct put her at significant risk of serious, immediate, and proximate harm; (3) the risk was obvious or known to Detective Johnson; (4) Detective Johnson acted recklessly in conscious disregard of the risk; and (5) in total, Detective Johnson's conduct shocks the conscience. <u>Hart</u>, 432 F.3d at 805. "[I]f the state acts affirmatively to place someone in a position of danger that he or she would not otherwise have faced, the state actor, depending on his or her state of mind, may have committed a constitutional tort." <u>S.S. v. McMullen</u>, 225 F.3d 960, 962 (8th Cir. 2000)(*en banc*).

Review of other cases involving the use of confidential informants is instructive. In <u>McClendon v. City of Columbia</u>, 305 F.3d 314, 326 (5th Cir. 2002), Detective Carney used Kevin Loftin as a confidential informant in assisting with drug investigations. Loftin spoke with the detective about a conflict that had arisen between Loftin and Peter McClendon. *Id.* at 319. Loftin feared retaliation from McClendon because he had supplied a gun to an individual who shot McClendon's friend. *Id.* The detective lent Loftin a handgun to protect himself. *Id.* Loftin shot McClendon. *Id.*

AO72A
(Rev. 8/82)

The Fifth Circuit concluded there was no evidence that Detective Carney acted with anything other than ordinary negligence. *Id.* at 326. It noted there was no indication that Detective Carney was aware that Loftin had violent intentions toward McClendon. *Id.* Loftin had no criminal record and a positive working relationship with Detective Carney as a confidential informant. *Id.* The court concluded that "[t]hus while Detective Carney's actions in providing Loftin with a gun were certainly inadvisable, there is no evidence in the record suggesting that he acted with knowledge that his conduct would pose a threat to McClendon's safety. Under these circumstances, no rational trier of fact could find that Detective Carney acted with any level of culpability beyond mere negligence." *Id.* It held that the facts did not demonstrate the violation of an actual constitutional rights. *Id;* see also Robertson v. Pennington, No. 3:05-0777, 2008 WL 7249619 (S.D. W. Vir. July 18, 2008)(Court rejected plaintiff's argument that the selection of confidential informant and the carrying out of the investigation gave rise to an enhanced risk that the confidential informant would harm plaintiff's liberty interests).

In Waddell v. Hendry County Sheriff's Office, 329 F.3d 1300 (11th Cir. 2003), the decision was made to use Terry Garnto, who had been convicted of battery, as a confidential informant. *Id.* at 1302. On two occasions, his release from jail was arranged. *Id.* Garnto was spending the Fourth of July weekend with a dealer and said he might be able to arrange a meeting with an agent. *Id.* Garnto consumed "substantial quantities of alcohol" and while driving crossed into the oncoming lane of traffic killing one person and causing severe injuries to two others. *Id.*

-11-

The accident victims filed suit claiming that their substantive due process rights were violated when Garnto was unlawfully released from jail, used as a confidential informant, and was not monitored. *Id.* at 1303. The court first concluded that the release from jail did not constitute a constitutional tort. *Id.* at 1307. Next, the court concluded that the decision to utilize Garnto as a confidential informant to make controlled drug purchases was not so "egregious as to establish a substantive due process violation." *Id.* It concluded the use did not reflect "such indifference to an extremely great risk to the safety of the public that this decision--when not viewed in hindsight with the results fully known--shocks the conscience." *Id.* (internal quotation marks and citations omitted).

In Matican v. City of New York, 524 F.3d 151 (2nd Cir. 2008), a confidential informant, Matican, brought an action against the City and three police officers after he was assaulted by a drug dealer. *Id.* at 153. Matican had set up the drug buy and the dealer was arrested. *Id.* Matican expressed concern for his safety prior to the drug buy if the dealer made bail. *Id.* He was told not to worry, that they would protect him. *Id.* After the dealer's arrest a criminal history check revealed that he had been arrested for possession of a handgun and assault with a box cutter. *Id.* at 154. Matican was not informed of the dealer's arrest history. *Id.* The dealer subsequently assaulted Matican with a box cutter, severely injuring him. *Id.*

The court found that the sting operation constituted a state-created danger. *Id.* at 159. However, it held that "Matican's allegations of affirmative conduct by the officers, even if true, do not shock the contemporary conscience. In designing the sting, the officers here had two serious competing obligations: Matican's safety and their own. . . . Because the officers were obligated to protect their own safety as well as Matican's, their design of the sting operation in

-12-

this case does not shock the conscience." *Id.*; see also Flint v. Belvidere, No. 11 C 50255, 2012 WL 470113 (N.D. Ill. Feb. 13, 2012)(case brought by confidential informant's estate for failure to protect the informant from a state created danger).

On the facts alleged in this case, I find as a matter of law that Detective Johnson's conduct does not shock the conscience. Although he was aware of Foster's prior criminal history, Foster's convictions were three years old at the time. Foster's use as a confidential informant was approved by his probation officer and a judge. Foster did not have a long history of repeated offenses and Detective Johnson had no reason to suspect that he posed a risk to the Plaintiff. Detective Johnson's conduct was at the most negligent. Negligence is insufficient to constitute a constitutional violation. Detective Johnson is therefore entitled to summary judgment and qualified immunity. See, e.g., Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

Having held that Detective Johnson's conduct did not violate Plaintiff's constitutional rights, I hold that even if that were not the case, he would still be entitled to summary judgment based on qualified immunity. "An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional rights that was clearly established at the time of the challenged conduct." Plumhoff v. Rickard, ___ U.S. ___, 134 S. Ct. 2012, 2023 (2014)(internal quotation marks and citation omitted). The contours of the right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Id.* (internal

-13-

quotation marks and citation omitted).   As the survey of the law above indicates, the law was not clearly established that the use of a confidential informant, with a three year old conviction for assault and promoting prostitution, for controlled drug buys would violate clearly established law.

This leaves the official capacity claim.  A Plaintiff "seeking to impose liability on a municipality under § 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury." Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403 (1997).  "There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." Moyle v. Anderson, 571 F.3d 814, 817-18 (8th Cir. 2009)(citation omitted).  Plaintiff admits that she can point to no unconstitutional policy or custom with respect to any of her claims.  Clearly, this falls far short of suggesting the existence of an unconstitutional policy, custom, or practice.

### 3.  Foster's Failure to Answer the Complaint

The United States Marshal's Service served Foster by certified mail on September 15, 2015.  (Doc. 33).  Foster failed to answer the complaint and, on March 14, 2016, a notice of default procedures (Doc. 56) was directed to the Plaintiff. Plaintiff was advised of the steps to take to seek a default judgment against Foster pursuant to Fed. R. Civ. P. 55, including moving for a default judgment either by the Clerk of the Court or by the Court within 14 days.  Plaintiff was advised that her failure to seek a default judgment within the prescribed time could result in the dismissal of her claims against Foster for failure to prosecute.  As of this date, Plaintiff

-14-

has not taken any steps to seek a default judgment against Foster.  Accordingly, the undersigned recommends that Plaintiff's claims against Foster be dismissed for failure to prosecute pursuant to Fed. R. Civ. P.  41(a)(2).

**4.  Conclusion**

For the reasons stated, I recommend that Defendant Johnson's Motion for Summary Judgment (Doc.  50) be **GRANTED**, that Plaintiff's claims against Defendant Foster be **DISMISSED FOR FAILURE TO PROSECUTE**, and that this case be **DISMISSED WITH PREJUDICE.**

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 27th day of July 2016.

_/s/ Erin L. Setser_
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)